IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
September 4, 2024 Session

**STATE OF TENNESSEE v. MARLOS LEKEITH TIPTON**

**Appeal from the Circuit Court for Henderson County**
**No. 22-145-2    Donald H. Allen, Judge**

_____

**No. W2023-00551-CCA-R3-CD**

_____

The Defendant, Marlos LeKeith Tipton, appeals from his convictions for vehicular homicide and speeding following a bench trial.  Specifically, the Defendant contends that he was deprived of a fair trial based on the trial court's denial of funding for a defense expert in vehicle collisions.  He further argues that the proof was insufficient to support his conviction of vehicular homicide based upon reckless conduct predicated on excessive speed alone.  After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

KYLE A. HIXSON, J., delivered the opinion of the court, in which TIMOTHY L. EASTER and J. ROSS DYER, JJ., joined.

Jessica F. Butler (on appeal), Assistant Public Defender – Appellate Division, Tennessee District Public Defenders Conference, for the appellant; and Marlos LeKeith Tipton, Pro Se (at trial), Lexington, Tennessee.

Jonathan Skrmetti, Attorney General and Reporter; Abigail H. Rinard and George Kirby May, Assistant Attorneys General; Jody S. Pickens, District Attorney General; and Eric V. Wood, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

### I.    FACTUAL AND PROCEDURAL HISTORY

This case arises from a two-vehicle collision on Interstate 40 in Henderson County on April 10, 2022, at approximately 1:00 a.m. that resulted in the death of the victim, Maria Ortega.  Ms. Ortega was the backseat passenger in a 2009 H3 Hummer at the time it was

struck by a 2021 Toyota Camry driven by the Defendant. After an investigation by the Tennessee Highway Patrol ("THP") Critical Incident Response Team ("CIRT"), a Henderson County grand jury indicted the Defendant for vehicular homicide and speeding. *See* Tenn. Code Ann. §§ 39-13-213; 55-8-152. The Defendant, though indigent, repeatedly waived his right to counsel at numerous preliminary proceedings, and he rejected the trial court's offer to appoint the district public defender's office to represent him on multiple occasions. Having also executed a written waiver of his right to a jury trial, the Defendant represented himself in the pretrial proceedings and at a one-day bench trial, which was held on February 22, 2023.

Prior to trial, the Defendant filed a pro se motion requesting funds to hire a collision expert for his defense, contending that this "material witness" was necessary for the protection of his constitutional rights and that, pursuant to the Tennessee Rules of Evidence, he was entitled to be "afforded an opportunity to contest and rebut the facts" relied upon by the State. A hearing regarding this motion took place on December 6, 2022, at which the Defendant argued that he "need[ed] somebody who can counter the [State's] theory" regarding "how the collision happened." The State responded that members of CIRT with THP would testify regarding their investigation and subsequent report and that their qualifications would be produced at trial. The trial court stated that whether one or more members of CIRT could be declared experts would largely depend on these later-introduced qualifications, stating "if they're going to give their opinions about . . . how the collision occurred or what . . . the results of the collision were, . . . they may have to provide whatever information they have in terms of their experience and qualifications[.]"

When the Defendant was given an opportunity to respond, he alleged that the THP investigators had pursued charges against him based solely on his race, rather than penalizing the other driver, who was unlicensed and uninsured. The Defendant further asserted that he had subpoenaed a witness from the Tennessee Department of Safety and Homeland Security who would allegedly testify that the driver of the other vehicle was "99 percent responsible" for the collision. The Defendant stated that he needed her testimony as well as a collision expert for his defense, but he did not expand upon his expert funding request beyond asserting that he did not believe law enforcement officers could be collision experts. At the conclusion of the argument on this issue, the trial court denied the Defendant's request for a collision expert, which was memorialized by a written order filed on December 8, 2022.

The proof introduced at trial showed that, at approximately 1:00 a.m. on April 10, 2022, Angel Lopez was driving the Hummer eastbound on Interstate 40 with his friend, Aldana Cruz, in the passenger seat, and Mr. Cruz's wife, Ms. Ortega, seated behind her

husband.[1] Mr. Lopez testified that he was driving seventy miles per hour when he suddenly saw "someone driving really fast. He rear-ended us." Mr. Lopez stated that the Hummer was higher above the ground than the vehicle that struck it from behind, and the other vehicle went underneath the Hummer causing it to do "turns" multiple times and leave the highway. In the aftermath of the collision, Mr. Lopez was able to assist Mr. Cruz out of the vehicle, but he stated that Ms. Ortega was "dead already" at that point. On cross-examination, Mr. Lopez confirmed that he did not have a driver's license or insurance, and he was not a United States citizen.

Following Mr. Lopez's testimony, Mr. Cruz testified that, at the time of the collision, he had been talking with Mr. Lopez when they "felt a bump from behind" and then began making "turns and loops and everything" before his memory failed him. However, he remembered Mr. Lopez assisting him out of the vehicle and learning that his wife had not survived.

THP Trooper Shavonna Rivers testified that she responded to the scene in the aftermath of the collision and observed the Defendant standing in the median on the left side of the roadway next to the Camry. She later observed the Hummer off the right side of the roadway on its side resting up against a tree with a person pinned underneath it. At the time she arrived, Mr. Cruz had already been transported to the hospital, but she approached Mr. Lopez where he stood in the right emergency lane near the Hummer. Mr. Lopez told Trooper Rivers that he was the driver of the Hummer, and another vehicle struck him, which caused the Hummer to roll and come to rest in the tree line off the roadway. Mr. Lopez stated that he was not under the influence of any intoxicating or illegal substances, and he consented to a blood draw.

Trooper Rivers then spoke with the Defendant and stated that, upon approaching him, she "observe[d] an odor of marijuana about his person." The Defendant admitted that he had smoked marijuana earlier in the night, but he became agitated and uncooperative when Trooper Rivers attempted to perform field sobriety tests. He then refused to consent to a blood draw. The Defendant stated that he was the driver of the Camry, the Hummer had attempted to enter his lane, and he swerved to move out of the way but "clipped" the Hummer and ended up in the median. Trooper Rivers took photographs of both vehicles at the scene, including photographs of Ms. Ortega's body pinned underneath the Hummer,

---

[1] Both Mr. Lopez and Mr. Cruz testified at the Defendant's trial through a certified court interpreter. In the transcript of their respective testimonies, Mr. Lopez identified himself by the name Angel Elias Lopez Lopez, Mr. Cruz identified himself by the name Cruz Aldana Aldana, and the victim was also identified by the name Maria del Rosario Morales Ortega. We refer to them in this opinion as Mr. Lopez, Mr. Cruz, and Ms. Ortega for consistency with the record. No disrespect is intended.

which were introduced as collective exhibits without objection. On cross-examination, Trooper Rivers stated that no citations were issued to either driver on the night of the collision due to the ongoing nature of the investigation.

THP Lieutenant Andy Forsythe testified that he was the patrol supervisor on duty at the time of the collision and that he responded to the scene because there had been a fatality. Lt. Forsythe observed the damage to the roadway and to both vehicles. Based upon the markings on the roadway, he believed that both vehicles had been traveling in the left lane when the collision occurred and that it was a front- to rear-end collision based on the damage to each of the vehicles. He described the impact as having caused the Hummer to begin a "yaw," which he explained meant sliding and rotating on its axis from the point of the collision to its final rest in the tree line off the roadway. Based upon the length of the yaw, Lt. Forsythe stated that he believed the collision involved "at least roadway speed" at the time of the impact. He also spoke with the Defendant about his refusal to consent to a blood draw. After the Defendant stated he could possibly have "old marijuana" in his system, Lt. Forsythe explained that the test could differentiate between "marijuana that had already metabolized and marijuana that would be active" and obtained the Defendant's consent. However, after the Defendant was transported to the hospital, he ultimately refused to consent to the blood draw, and no testing was performed.

On cross-examination, Lt. Forsythe acknowledged that he had not been declared an expert, but his observations about the crash scene were consistent with his knowledge of the subject, which was based upon his "25 years of experience, the training, the classes, and years of investigating crashes and also, supervising serious crashes." He further stated that the area of impact "leaves certain marks on the road that we are trained to look for."

THP Trooper Shane Moore testified that he was a CIRT member with extensive education and training in both basic and advanced crash investigations, as well as technician training involving electronic data collected by airbag control modules. Trooper Moore listed eight instances from 2014 through 2019 in various counties wherein he had been declared an expert witness in crash reconstruction, and a copy of his curriculum vitae was entered as an exhibit. The State then requested that Trooper Moore be declared an expert witness in crash reconstruction. At the trial court's request, the State elicited more specific details regarding Trooper Moore's specialized training and ongoing education in the field of crash reconstruction, and he stated that he initially completed a month-long advanced investigation course and now underwent at least four training courses involving crash reconstruction per year. The State then made its second request for the trial court to declare him an expert witness. Again at the trial court's request, the State elicited more specific details regarding Trooper Moore's professional experience in crash reconstruction,

and he estimated that he had investigated around 2,000 collisions involving fatalities over the past thirteen years. For a third time, the State requested that Trooper Moore be declared an expert witness. The trial court then allowed the Defendant to question Trooper Moore about his qualifications, and Trooper Moore maintained that he was an expert in his field, despite the Defendant's attempts to elicit testimony that, when Trooper Moore responded to investigate a crash scene, his expertise did not exist "before the fact." At the conclusion of the Defendant's questioning, the trial court found that Trooper Moore had the "specialized training, experience, knowledge, and education" required to allow him to give his opinion as a crash reconstruction expert.

Trooper Moore then testified that, during the early morning of April 10, 2022, he received a call from Lt. Forsythe at approximately 1:30 a.m. regarding the collision in this case, and he responded to conduct his investigation during daylight hours later that morning as requested. He took photographs of the scene that were introduced as a collective exhibit. He used these photographs as a demonstrative aid to point out the marks left by the Hummer in its yaw from the point of impact to its final rest in the tree line, and he also identified the "heavy braking" marks left by the Camry from the point of impact to its final rest in the median. Trooper Moore confirmed that the length of the markings indicated the vehicles were traveling at least at highway speeds and opined that "[t]here was no stopping prior to this crash occurring." Trooper Moore stated that most rear-end collisions involved a stopped vehicle, but the absence of that in this case prompted further investigation. Trooper Moore next examined the vehicles at the impound lot, took additional photographs that were introduced as a collective exhibit, and completed a vehicle inspection report containing data about each of the vehicles' overall composition and damage post-collision. He observed the Hummer to be in significantly worse condition than the Camry. The Hummer's condition was consistent with a rollover event, based upon the top, front, and back surfaces of the vehicle displaying signs of having been "crushed in, caved in." By contrast, there was no damage to the Camry "from the front fenders back," and both doors were able to be opened.

Trooper Moore also extracted and reviewed the crash data record ("CDR") from the airbag control module of each of the vehicles. He described this module as being the "brain" of the vehicle that constantly reads and senses data to determine whether to deploy the airbags, and it records certain data surrounding airbag deployment depending on the type of vehicle. The CDR for the Hummer included 2.5 seconds of data prior to the airbag deployment. From this point until the deployment of the airbags, the Hummer was traveling at seventy miles per hour with the throttle at zero percent and a continuous engine speed of 2,432 rotations per minute. From this data, Trooper Moore opined that the vehicle's cruise control was enabled because of the unchanging nature of the readings. The

CDR also indicated that the driver and front seat passenger were wearing their safety belts. However, the safety belt data for the rear seat was not recorded by this model.

The CDR for the Camry, being a newer model of vehicle, included 4.95 seconds of data prior to airbag deployment and included additional data points not collected by the unit in the Hummer. At the time of the data collection initiation, the Camry was traveling at 101.9 miles per hour with the throttle at zero percent and an engine speed of 3,700 rotations per minute. The engine speed continuously declined until 0.45 seconds before the airbag deployment, at which point the data indicated a speed of 31 miles per hour with the accelerator pedal at 83 percent and the service brake engaged. Approximately 3.5 seconds after the airbag deployment, the shift position changed from drive to neutral. The data also indicated that the Defendant, as the driver of the Camry, was wearing his safety belt throughout the data collection period.

Trooper Moore opined, based on this data and his observations of the crash site, that the Camry was overtaking the Hummer in the same lane of travel at a speed just over thirty miles per hour greater than the Hummer was traveling. A rear-end collision occurred at that speed in the left lane, which lifted the Hummer and sent it off into a yaw, while the Camry was slowed by the collision and brake application. Trooper Moore stated it was not uncommon for both accelerator and braking data to occur after a rear-end collision, due to the driver of the vehicle being thrown forward and jostled by the force of the crash.

During his investigation, Trooper Moore also learned that the Camry was owned by Advantage Car Leasing and that it contained an anti-theft global positioning system ("GPS") data collection system in addition to the airbag control module. He was able to collect more information from this GPS onboard data recorder, including location and miles per hour the vehicle was traveling whenever it was driven. Trooper Moore paid particular attention to the data collection points for April 10, 2022, between 1:05 a.m. and 1:13 a.m., which was the time of the collision indicated by the data recorders. During that time period, the GPS data showed that the Camry was traveling at 117 miles per hour, 129 miles per hour, 111 miles per hour, 103 miles per hour, 107 miles per hour, 105 miles per hour, 120.55 miles per hour, 95 miles per hour, 98 miles per hour, 93 miles per hour, and 101 miles per hour at the time of the collision.

At the conclusion of his review of all of the data collected by the recording systems, the roadway at the collision site, and the damage to both of the vehicles involved, Trooper Moore opined that the Camry was "definitely the at-fault vehicle" in the collision. The reports he compiled relating to the collision and the data he collected during his investigation were entered into evidence.

On cross-examination, Trooper Moore clarified that the Camry collided with the left side of the Hummer's rear end, which caused the vehicle to enter a clockwise yaw. He stated that if it had hit on the right side of the vehicle's rear end, the Hummer would have rotated counterclockwise. Trooper Moore also confirmed that a Camry weighed a sufficient amount to hit a larger vehicle such as a Hummer hard enough to knock it off its axis, as occurred here. The Defendant identified a portion of Trooper Moore's data that indicated the Camry had experienced a "rollover event," but Trooper Moore clarified that the CDR could interpret lateral acceleration combined with an increase in momentum as though it had experienced a rollover. He also opined that it would likely record such a finding if the vehicle had only two wheels on the roadway at some point during the aftermath of the collision. The Defendant vigorously cross-examined Trooper Moore on the accuracy of his report and the methods he used to collect and report the data from the CDR in both vehicles. However, Trooper Moore maintained that the software he used to download the data was reliable in his opinion and that he used published data regarding the specifications of the vehicles to perform the calculations in his report.

Regarding the tire marks left at the scene, Trooper Moore stated that the "flat black" marks left on the shoulder by the Camry indicated that the tire was almost flat or "had some issues going on." The Defendant attacked this testimony with the inventory report of the vehicle completed after the collision, which stated that the tires were aired up. Trooper Moore then clarified that, during the collision, the Camry went underneath the Hummer and had the weight of the Hummer pressing down on it, which in his opinion accounted for the markings. The Defendant continued to present what he believed to be inconsistencies in the CDR report from the Camry regarding whether the collision was a frontal, side, or a rollover event, but Trooper Moore directed his attention to different sections of the report that explained the recorded data. He also emphasized that the data collected by the CDR was obtained within five seconds and that many of the specific points reported were measured in milliseconds, including those that the Defendant claimed supported his theory that a sideways collision had occurred. In conducting an analysis of this data, Trooper Moore directed the Defendant's attention to the numerous pages of the report that consistently reported the Camry's speed at greater than 100 miles per hour.

At the conclusion of his cross-examination, the Defendant attempted to elicit testimony from Trooper Moore regarding whether he believed the victim would have been injured as severely if she had been wearing her safety belt. Trooper Moore responded that medical questions were beyond his field of expertise.

Dr. Kevin Jenkins testified that he was the assistant medical examiner in Davidson County and that he performed the victim's autopsy. Following questions from both parties regarding his qualifications, Dr. Jenkins was declared an expert witness in the field of forensic pathology without objection, and his report was entered into evidence. He testified that the victim had suffered numerous broken bones, lacerations and bruising to multiple internal organs, a subdural hemorrhage, and blood was present surrounding her brain and abdomen. Dr. Jenkins declared the cause of death to be multiple blunt force injuries with a contributing cause of mechanical asphyxia, which he explained meant the victim was unable to breathe due to the weight of the vehicle when she was pinned beneath it. When the Defendant asked if the victim's injuries occurred because of the collision or "from the actual victim being tossed around up against something," Dr. Jenkins replied that he could not answer that from the autopsy.

The State rested its case-in-chief at the conclusion of Dr. Jenkins' testimony. The Defendant did not put on any proof but moved for a judgment of acquittal. After hearing argument on the motion, within which the Defendant incorporated much of his closing argument on the case, the trial court denied the Defendant's motion. The State next made its closing argument and remarked that "[t]he undisputed testimony is that Ms. Ortega was the back seat passenger in the vehicle traveling seventy miles per hour in a seventy mile per hour zone, and they were rearended in the left lane by [the Defendant]." The Defendant responded by making an additional argument that the victim would not have suffered injury if she had been wearing her safety belt, Mr. Lopez created the danger by being an unlicensed driver on the road, and there was "no evidence that [the Camry] was traveling that fast" because contradictions in the reported data indicated all portions of it could be inaccurate. The Defendant further argued there was "not one shred of evidence that prove[d] that it was a rear-end to front-end collision." In rebuttal, the State agreed with the Defendant that "driving a motor vehicle on the roads is an inherently dangerous activity," but the data relating to the Camry's speed came from two computerized sources that independently confirmed the Defendant was traveling over 100 miles per hour at the time of the collision.

The trial court found that the evidence established that the Defendant was traveling 101.9 miles per hour at the time of the collision, and it found the Defendant guilty of the offense of speeding in count 2. Regarding the offense of vehicular homicide by reckless conduct alleged in count 1, the trial court remarked,

[T]he State has to prove beyond a reasonable doubt that the [D]efendant . . . killed the alleged victim by the operation of a motor vehicle and that . . . the [D]efendant was acting recklessly at the time of the motor

vehicle crash . . . [and the death of the victim] was the proximate result of conduct of the [D]efendant creating a substantial risk of death or serious bodily injury[.]

The trial court credited the testimony of Mr. Lopez and Trooper Moore regarding the speed of the vehicles, stating "I don't think there's a whole lot of question that [the Defendant's] excessive speed is what created a substantial risk of death and actually caused the death of Ms. Ortega." The trial court found that driving at this excessive speed constituted reckless conduct, the proximate result of which was the death of the victim, and it found the Defendant guilty of vehicular homicide. Following a sentencing hearing on April 11, 2023, the Defendant received a sentence of fifteen years' incarceration as a Range III, persistent offender.

The Defendant filed a timely notice of appeal.

## II.    ANALYSIS

### A.    Expert Funding

The Defendant contends on appeal that he was deprived of a fair trial due to the trial court's denial of his request for funding to secure a defense collision expert. The State responds that the trial court properly denied the Defendant's request based upon his failure to establish a particularized need for expert funds. We agree with the State.

The right to a fair trial is guaranteed in part by the Due Process Clause of the United States Constitution and its counterpart in the Tennessee Constitution. U.S. Const. amend. XIV, § 1; Tenn. Const. art. I, § 8; *see State v. Rimmer*, 623 S.W.3d 235, 256 (Tenn. 2021). The Fourteenth Amendment of the United States Constitution prohibits state governments from depriving any person "of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV, § 1. Similarly, article 1, section 8 of the Tennessee Constitution provides, "[N]o man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land." "Due process, at its most basic level, 'mean[s] fundamental fairness and substantial justice.'" *State v. White*, 362 S.W.3d 559, 566 (Tenn. 2012) (quoting *Vaughn v. State*, 456 S.W.2d 879, 883 (1970)).

The Supreme Court of the United States first addressed the due process guarantee in the context of expert services for indigent defendants in *Ake v. Oklahoma*, 470 U.S. 68 (1985). Though *Ake* addressed the denial of psychiatric expert assistance to a defendant

raising the insanity defense in a capital case, the Court focused its analysis of the issue on "meaningful access to justice." *Id.* at 77.

> [W]hen a State brings its judicial power to bear on an indigent defendant in a criminal proceeding, it must take steps to assure that the defendant has a fair opportunity to present his defense. This elementary principle, grounded in significant part on the Fourteenth Amendment's due process guarantee of fundamental fairness, derives from the belief that justice cannot be equal where, simply as a result of his poverty, a defendant is denied the opportunity to participate meaningfully in a judicial proceeding in which his liberty is at stake.

*Id.* at 76. Such fundamental fairness, the Court concluded, requires the states to provide indigent defendants with the "basic tools of an adequate defense or appeal." *Id.* at 77 (citation omitted).

In reliance on this principle, our own supreme court has recognized that this protection also applies in non-capital cases "because the due process principle of fundamental fairness requires that a State which prosecutes an indigent defendant assure that defendant of a fair opportunity to present his defense." *State v. Barnett*, 909 S.W.2d 423, 428 (Tenn. 1995). However, "the right to assistance of state paid experts exists only upon a showing of a particularized need" wherein the defendant "must show that a substantial need exists *requiring* the assistance of state paid supporting services and that his defense cannot be fully developed without such professional assistance." *Id.* at 430 (quoting *State v. Evans*, 838 S.W.2d 185, 192 (Tenn. 1992)). Additionally, "the expert assistance sought by a defendant need not be limited to a particular field of expertise, so long as the assistance is necessary to protect the defendant's constitutional rights." *State v. Scott*, 33 S.W.3d 746, 752 (Tenn. 2000).

The Tennessee Supreme Court adopted Rule 13 as the procedural framework for administration of these funds. When an indigent defendant seeks funding for expert services, a motion must be filed in the trial court itemizing

(A) the nature of the services requested;

(B) the name, address, qualifications, and licensure status, as evidenced by a curriculum vitae or resume, of the person or entity proposed to provide the services;

(C) the means, date, time, and location at which the services are to be provided; and

(D) a statement of the itemized costs of the services, including the hourly rate, and the amount of any expected additional or incidental costs.

Tenn. Sup. Ct. R. 13, § 5(b)(2).  If the motion satisfies these requirements, "the trial court must conduct an *ex parte* hearing on the motion and determine if the requested services are necessary to ensure the protection of the defendant's constitutional rights."  *Id.* § 5 (b)(4).  In conducting such a hearing, the trial court must determine, *inter alia*, that there is a particularized need for the requested services in order for it to properly authorize funding for said services.  *Id.* § 5(c)(1).

> Particularized need in the context of criminal trials and appeals is established when a defendant shows by reference to the particular facts and circumstances that the requested services relate to a matter that, considering the inculpatory evidence, is likely to be a significant issue in the defense at trial, including both the guilt and sentencing phases, and that the requested services are necessary to protect the defendant's right to a fair trial.

*Id.* § 5 (c)(2) (citing *Barnett*, 909 S.W.2d at 423).  However, a particularized need cannot be established by a motion that contains only "undeveloped or conclusory assertions" that expert services would be beneficial to the defendant, or assertions establishing "only the mere hope or suspicion that favorable evidence may be obtained" using such services.  *Id.* § 5(c)(4)(A), (B) (citing *Barnett*, 909 S.W.2d at 430).

Our supreme court has held that a trial court has no obligation to provide an indigent defendant with funding for expert assistance unless the defendant makes this threshold "showing of a particularized need," which must be so substantial that a "defense cannot be fully developed" without such expert assistance.  *Barnett*, 909 S.W.2d at 430 (quoting *Evans*, 838 S.W.2d at 192).  To that end, it adopted a two-pronged test to determine whether this threshold showing has been made: "(1) the defendant must show that he or she 'will be deprived of a fair trial without the expert assistance'; and (2) the defendant must show that 'there is a reasonable likelihood that [the assistance] will materially assist [him or her] in the preparation of [the] case.'"  *Scott*, 33 S.W.3d at 753 (quoting *Barnett*, 909 S.W.2d at 430).  However, our supreme court also cautioned that

> [u]nsupported assertions that [an] expert is necessary to counter the State's proof are not sufficient.  The defendant must demonstrate by reference to the

facts and circumstances of [the] particular case that appointment of a[n] . . . expert is necessary to insure a fair trial. Whether or not a defendant has made the threshold showing is to be determined on a case-by-case basis, and in determining whether a particularized need has been established, a trial court should consider all facts and circumstances known to it at the time the motion for expert assistance is made.

*Id.* (quoting *Barnett*, 909 S.W.2d at 431). We review a trial court's denial of an indigent defendant's request for expert assistance under an abuse of discretion standard. *Barnett*, 909 S.W.2d at 431.

We begin by noting the inadequacies in the Defendant's motion to the trial court. The Defendant's motion noted his indigence and asserted that an "[e]xpert [c]ollision [w]itness [wa]s [m]aterial to [his] [d]efense" to ensure the "full disclosure of all relevant facts and issues[.]" However, the Defendant's motion did not identify an expert, provide information regarding his or her qualifications, describe the manner of the assistance to be provided, or include an estimation of the associated cost. Given the motion's noncompliance with the majority of the requirements enumerated by Rule 13, the trial court could have summarily denied the motion without conducting a hearing. *See Barnett*, 909 S.W.2d at 430 (concluding that a hearing is required upon a motion conforming with the requirements of Rule 13).

Despite the inadequacies in the Defendant's pro se motion, the trial court allowed the Defendant to be heard on his motion in a pretrial hearing.[2] At the pretrial hearing, the Defendant argued to the trial court that the other driver was responsible for the collision and that he did not believe that members of CIRT could be collision experts. However, the most specific argument the Defendant made regarding the requested funding was that he needed an expert to counter the State's theory of how the collision occurred. Additionally, the Defendant represented to the trial court that he would produce another witness at trial to testify that the other driver was at fault in the collision—separate and distinct from his request for a collision expert.

As such, the only facts and circumstances for the trial court to consider independently regarding the Defendant's particularized need for expert assistance was his argument that the State's witnesses did not have any collision expertise. However, this

---

[2] Had the Defendant filed a motion that complied with Rule 13, he would have been entitled to an *ex parte* hearing. *See Barnett*, 909 S.W.2d at 430 (concluding that an *ex parte* hearing is required when the procedural criteria are satisfied). The Defendant, however, did not request an *ex parte* hearing in this instance and instead chose to address the issue in open court with the State present.

assertion was both premature, in that the State's witnesses' qualifications had not yet been produced, and unsupported by any reference to the Defendant's own need for a collision expert. In addition, the Defendant relied solely on his statement that he needed an expert to counter the State's proof, which our supreme court has declared to be inadequate. *Scott*, 33 S.W.3d at 753 ("Unsupported assertions that [an] expert is necessary to counter the State's proof are not sufficient.") (quoting *Barnett*, 909 S.W.2d at 431). The Defendant failed to establish a particularized need for expert assistance by relying only on unsupported assertions that are insufficient to meet this threshold requirement. *See Barnett*, 909 S.W.2d at 430. We thus cannot conclude that the trial court abused its discretion in denying his request.

On appeal, the Defendant cites the State's use at trial of CDR and GPS data—introduced through its own expert to prove the Defendant's speed and nature of the collision—to argue that a defense expert could have provided "different context for this data, questioned the veracity of the State's reading of this data, or established doubt surrounding the data itself" and that such expert assistance was "vital" to his defense. However, our review is limited to what the trial court actually considered in making its ruling. "[A]n appellate court's jurisdiction is 'appellate only.'" *State v. Bristol*, 654 S.W.3d 917, 925 (Tenn. 2022) (quoting Tenn. Const. art. VI, § 2). "[A] party is bound by the ground asserted when making an objection. The party cannot assert a new or different theory to support the objection in the motion for a new trial or in the appellate court." *State v. Adkisson*, 899 S.W.2d 626, 634-35 (Tenn. Crim. App. 1994). Stated another way, a party is bound by the evidentiary theory argued to the trial court and may not change or add theories on appeal. *State v. Alder*, 71 S.W.3d 299, 303 (Tenn. Crim. App. 2001). We must only consider issues raised on the grounds as they were argued in the trial court, not as the Defendant wishes had been raised by arguing them with more specificity on appeal. *See id.* We reiterate, based on the information actually presented to the trial court for its consideration, no abuse of discretion occurred. The Defendant is not entitled to relief.

## B. Vehicular Homicide

The Defendant asserts on appeal that proof of a vehicle traveling over 100 miles per hour is not sufficient to establish reckless conduct as an element of vehicular homicide. The State responds that the Defendant's sustained travel at speeds over 100 miles per hour, at speeds of 30 to 60 miles per hour over the posted speed limit, in the darkness of the early morning hours, and on a public roadway are sufficient to support the finding that his conduct was reckless. We agree with the State.

As stated above, the United States Constitution prohibits the states from depriving "any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV, § 1.  A state shall not deprive a criminal defendant of his liberty "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970).  In determining whether a state has met this burden following a finding of guilt, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  Because a guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, the defendant has the burden on appeal of illustrating why the evidence is insufficient to support the jury's verdict.  *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).  If a convicted defendant makes this showing, the finding of guilt shall be set aside.  Tenn. R. App. P. 13(e).

"Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact."  *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).  Appellate courts do not "reweigh or reevaluate the evidence."  *Id*. (citing *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978)).  "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State."  *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973).  Therefore, on appellate review, "the State is entitled to the strongest legitimate view of the trial evidence and all reasonable or legitimate inferences which may be drawn therefrom."  *Cabbage*, 571 S.W.2d at 835.  "In a bench trial, the verdict of the trial judge is entitled to the same weight on appeal as a jury verdict."  *State v. Holder*, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (citing *State v. Hatchett*, 560 S.W.2d 627, 630 (Tenn. 1978)).

The Defendant was convicted of vehicular homicide, which in this case involved "the reckless killing of another by the operation of an automobile . . . as the proximate result of . . . [c]onduct creating a substantial risk of death or serious bodily injury to a person[.]"  Tenn. Code Ann. § 39-13-213(a)(1).  We necessarily look to the statutory definition of the term "reckless" to address the Defendant's argument.

> "Reckless" refers to a person who acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur.  The risk must be of such a nature and degree that its disregard constitutes a gross deviation from

the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

*Id*. § -11-302(c).

The Defendant relies heavily on *State v. Wilkins*, 654 S.W.2d 678 (Tenn. 1983), to support his contention that excessive speed alone cannot establish recklessness. In *Wilkins*, the defendant's speed of 120 miles per hour on a highway with hills and curves was sufficient to sustain a reckless driving conviction. *Id.* at 680. According to the Defendant, in *Wilkins*, our supreme court "rejected the notion that excessive speed is per se evidence of reckless conduct," instead, concluding that while "speed can support a conviction, . . . it should be assessed in conjunction with other factors."

First, we note that the conviction offense in *Wilkins* was reckless driving, not vehicular homicide. *Id.* at 678. Unlike the vehicular homicide statute that includes a mens rea of recklessness, the offense of reckless driving requires proof of "willful and wanton disregard for the safety of persons or property" as an essential element. *See id.* at 679; *compare* Tenn. Code Ann. § 39-13-213(a) *with* § 55-10-205(a). Our supreme court in *Wilkins*, in concluding that the evidence was sufficient to support the defendant's conviction for reckless driving, determined that "[w]illful and wanton disregard for another's safety is a factual question properly determined from all the circumstances" and that "it is within the discretion of the finder of fact to consider that a motor vehicle's speed can be so fast as to constitute willful and wanton disregard for persons or property, be it the person and property of the driver or others on the road or in the area." *Id.* at 680. The analysis in *Wilkins* also expressly considered both geographical considerations of the roadway and that "[e]xcessive speeds cut down on one's reaction time." *Id.* at 680 n.1. Its holding, "that under certain facts and circumstances excessive speed can be sufficient to sustain a conviction of reckless driving," does not constrict our analysis in the manner the Defendant contends due to the difference in the conviction offenses. *Id.*

Furthermore, *Wilkins* is instructive to the case at bar, rather than prohibitive. Excessive speed does not exist in a vacuum, nor did the State rest on its proof in this case that the Defendant's vehicle reached such speeds. The proof introduced at trial established that the Defendant was traveling in the dark of night, on a public roadway with the potential to encounter other vehicles, and at speeds thirty to sixty miles per hour over the posted speed limit for a sustained period of time. While traveling at 101.9 miles per hour, the Defendant's vehicle collided in the same lane of travel with the left side of the Hummer's rearend, causing it to enter a yaw, experience a rollover event, and leave the roadway, resulting in the death of the victim. The trial court accredited the testimony of the State's

witnesses and the evidence introduced to establish the Defendant's speed, manner of the collision, and the location and time of the collision. We disagree with the Defendant's assertion that his excessive speed was "all that the State proved at trial."

This court has previously affirmed a conviction of vehicular homicide by reckless conduct under facts similar to the case at bar. *See State v. Mysinger*, No. 314, 1990 WL 26547, at *1 (Tenn. Crim. App. Mar. 14, 1990) (under prior law, affirming the jury's finding that the cause of the three deaths was the rear-end collision resulting from the defendant's speed of 90 to 106 miles per hour on a public highway). In another case, this court determined that it "need not decide whether [d]efendant's excessive speed alone was sufficient to establish that she acted recklessly because there was other evidence establishing recklessness." *State v. Saunders*, No. E1998-00230-CCA-R3-CD, 2000 WL 739455, at *5 (Tenn. Crim. App. June 8, 2000) (noting additional evidence considered by the jury that the defendant was concentrating on playing music rather than her driving such that she did not see the other car before the collision). These analyses emphasize the importance of the role of the trier of fact: to rationally consider the facts and circumstances surrounding an offense and apply the law to the evidence to reach a verdict.

Viewed in the light most favorable to the State, a rational trier of fact could reasonably infer from this proof that the Defendant disregarded a substantial and unjustifiable risk that—by traveling at such speeds under these circumstances—he could encounter another vehicle and be unable to avoid a potentially catastrophic collision based on the decreased reaction time flowing from his excessive speed. Indeed, this is precisely what happened. The Defendant is not entitled to relief.

### III.  CONCLUSION

Based upon the foregoing and consideration of the record as a whole, we affirm the judgments of the trial court.

_s/ Kyle A. Hixson_____
KYLE A. HIXSON, JUDGE